

# LAZARD DANA
### CERTIFIED PUBLIC ACCOUNTANTS

September 28, 2006

Lane C. Siesky
SIESKY LAW FIRM, PC
4424 Vogel Road, Suite 305
Evansville, IN 47715

RE: U.S. ex rel. Jeffrey E. Main vs. Oakland City University
Cause No.: 3:03 CV-71-RLY-WGH

Dear Mr. Siesky:

You retained me to provide my opinions concerning the above matter. In forming my opinions, I read the following documents:

- Plaintiffs Exhibits PLA 1 through PLA 79
- OCU Exhibits A through CC
- Copy of Oakland City University's representations concerning their participation in the Federal Student Financial Assistance Programs, dated May 31, 1997, on the letterhead of Naas, Kerney & Associates, unsigned
- United States Department of Education Memorandum, dated October 30, 2002, to Terri Shaw, Chief Operating Officer, Federal Student Aid from William D. Hansen, Deputy Secretary
- U.S. Department of Justice letter dated July 14, 2006 to Lane C. Siesky and James D. Johnson regarding data of federal awards for the period of July 1, 2000 to December 31, 2003
- Depositions of Beth Barber, James Wilson Murray, Ph.D., Caren Richeson, Jeffrey Main, Renal Eskew and Lora Lee Beck and exhibits thereto

My opinions are as follows:

1. At least from 1996 thru 2003, Oakland City University (OCU) paid its recruiters commission and bonus payments based upon success in securing enrollments;

2. OCU knew that paying incentive pay to recruiters was in violation of Federal statutes and regulations and in direct contradiction to the requirements of the U.S. Department of Education (ED) for participation in the Federal Student Aid Programs; and

---

Lazard Dana LLP
24 Drayton Street, Suite 800, Savannah, GA 31401
P.O. Box 9706, Savannah, GA 31412
Phone: (912) 238-1001   Fax: (912) 238-1701



3. The financial harm to the Government by OCU's actions totals approximately $8,974,368. In other words, OCU is liable to the Government for all of the non-loan Title IV funds, as well as a portion of the guaranteed loan funds, that flowed to OCU from 1996 through approximately November of 2003.

The basis and reasons for these opinions along with supporting exhibits are detailed below.

Incentive Payments

1. The document entitled "Interoffice Memorandum" dated March 11, 1996 and prepared by Randall Brown (PLA 5) clearly indicates that an incentive payment plan for OCU's recruiters was approved by President Murray and in place in 1996. This document also indicates that an incentive plan existed in some form prior to 1996.

2. There is abundant evidence that incentive payments were actually made during this time period. This evidence includes deposition testimony provided by Dr. James Murray, Caren Richeson, Beth Barber, Ranel Eskew and Lora Beck. Also, PLAs 8, 9, 15, 18, 50, 57, 58 and 59 all show payments were made. This evidence also indicates that OCU's management was aware of the payments.

3. Finally, the auditor's workpapers give clear evidence of incentive payments during the time period in question. (PLAs 57, 58 and 59).

At this point, I restate Section 487(a)(20) of the Higher Education Act (HEA) which provides that, as part of its program participation agreement, an institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid. This definition is contained in ED regulations Section 668.14(b)(22) and is restated in Chapter 1 of the Student Financial Aid Handbook and in the "Blue Book".


OCU's Knowledge That Incentive Payments Were Prohibited

Caren Richeson, OCU's director of financial aid, testified in her deposition that she learned that it would be illegal for OCU to pay its recruiters incentive pay. She also knew that other schools were in trouble with ED for incentive payments to recruiters. She learned of the prohibition against incentive payments at a conference and had an article about Indiana Wesleyan (PLA 61) in her possession at the financial aid office. According to her testimony, she confronted President Murray about OCU's incentive payment plan for recruiters and "clearly" communicated to him that it would be wrong for OCU to make such payments. According to her, President Murray denied the existence of the incentive payments. Lora Beck's testimony corroborates Caren Richeson's testimony in this regard.

Moreover, Beth Barber, OCU's business manager, testified that Caren expressed her concern about the incentive payments. So, the President, the director of financial aid and the business manager all had knowledge of incentive payments to recruiters that were in violation of ED's requirements for participation in the Federal Student Aid Program. Indeed, management officials at OCU are required annually, or periodically, to indicate, through written documents, that they not only understand, but comply with the various laws and regulations of the U.S. Department of Education in order to participate in ED's Title IV student financial assistance programs. Such documents include the

Program Participation Agreement, Fiscal Operations Report and Application to Participate (FSIAP) report, annual representation letters to OCU's auditors, and the "Blue Book". Members of management responsible for compliance with ED's regulations also indicated familiarity with requirements concerning incentive compensation contained in the annual Student Financial Aid Handbook. Further, for the President, the Financial Aid Officer and Business Manager to claim lack of knowledge of the above ED publications and failure to attend periodic training – offered throughout the state as well as nationally - in the administration of ED programs, makes their claim of lack of knowledge of the prohibition against the payment of incentives even more difficult to either understand or to accept.

Finally, the documents and depositions demonstrate that OCU knew the payments were wrong because OCU attempted to hide the nature and extent of the incentive pay program and to mislead the ED.

1. From the depositions of Caren Richeson (Page 23, lines 18 to 23 and Page 24, line 1) and the article about Indiana Wesleyan (PLA 61) which Caren Richeson referred to as being shown to Dr. Murray, as well as the deposition of Lora Lee Beck (Pages 18 through 20), it is very clear that President Murray had clear knowledge that the payment of commissions were prohibited. The fact that Dr. Murray denied knowledge of payment of commissions when confronted by Karen Richeson, further demonstrates that Dr. Murray knew that the payment of commissions was wrong.

2. In the school's letter to ED, dated January 13, 2004, the school represented that it learned of an alleged violation. The letter went on to state that in 2000, OCU relied upon a full-time employee staff as admission counselors, with compensation based upon fixed annual, written contracts. This statement is clearly not supported by the above and appears, to me, to be a blatant attempt to mislead ED. This attempt is furthered in "2." of that letter wherein OCU appears to indicate that the plan to pay commissions was adopted January 1, 2001. This appears to be a further attempt to mislead ED.

3. It must be pointed out that the above "voluntary" disclosure of the "alleged violation" was made after the subject lawsuit of this matter was filed late in 2003.

4. OCU's computer servers were "swapped" sometime in 2003.

5. Finally, payments of commissions were characterized as "payroll advances" and were paid from the general checking account instead of from the payroll account. Such a procedure would allow for harder detection as commission payments. None of the incentive payments were included in the compliance sections of their audit reports.

Damages Suffered By The ED

Based upon my estimations, the total amount of funds that should be questioned as a result of the payment of these commissions is approximately $8,974,368 – for the period of June 1, 1997 through May 31, 2003, plus any amounts disbursed from May 31, 2003 until the payment of commissions stopped – presumably November 2003. My calculation is as follows:

| Title IV Program | Year/Period Ended | Source of Data (Exhibit) | % Federal Funds | | Total Amount |
|---|---|---|---|---|---|
| Pell Grant | | | | | |
| | May 31, 1998 | PLA 21, p. 5 | | $581,224 | |
| | May 31, 1999 | PLA 31, p. 5 | | 656,393 | |
| | May 31, 2000 | PLA 24, p. 11 | | 727,949 | |
| | May 31, 2001 | PLA 32, p. 12 | | 780,389 | |
| | May 31, 2002 | PLA 33, p. 13 | | 1,000,609 | |
| | May 31, 2003 | PLA 34, p. 13 | | 1,069,329 | |
| | Nov. 30, 2003 | estimated at 1/2 year | | 534,665 | $5,350,558 |
| FSEOG | | | | | |
| | May 31, 1998 | PLA 21, p. 5 | 75% | $171,863 | |
| | May 31, 1999 | PLA 31, p. 5 | 75% | 189,401 | |
| | May 31, 2000 | PLA 24, p. 11 | 75% | 194,017 | |
| | May 31, 2001 | PLA 32, p. 12 | 75% | 183,125 | |
| | May 31, 2002 | PLA 33, p. 13 | 75% | 295,063 | |
| | May 31, 2003 | PLA 34, p. 13 | 75% | 288,092 | |
| | Nov. 30, 2003 | estimated at 1/2 year | | 144,046 | $1,465,605 |
| FW-S | | | | | |
| | May 31, 1998 | PLA 21, p. 5 | 75% | $144,598 | |
| | May 31, 1999 | PLA 31, p. 5 | 75% | 131,804 | |
| | May 31, 2000 | PLA 24, p. 11 | 75% | 182,092 | |
| | May 31, 2001 | PLA 32, p. 12 | 75% | 182,269 | |
| | May 31, 2002 | PLA 33, p. 13 | 75% | 120,554 | |
| | May 31, 2003 | PLA 34, p. 13 | 75% | 167,645 | |
| | Nov. 30, 2003 | estimated at 1/2 year | | 83,823 | $1,012,785 |
| | | | | | $7,828,947 |
| FFEL* | | | | | |
| | May 31, 1998 | PLA 21, p. 5 | | $1,533,571 | |
| | May 31, 1999 | PLA 31, p. 5 | | 1,271,559 | |
| | May 31, 2000 | PLA 24, p. 11 | | 1,472,484 | |
| | May 31, 2001 | PLA 32, p. 12 | | 1,940,811 | |
| | May 31, 2002 | PLA 33, p. 13 | | 3,062,578 | |
| | May 31, 2003 | PLA 34, p. 13 | | 3,182,163 | |
| | Nov. 30, 2003 | estimated at 1/2 year | | 1,591,082   $14,054,248 | 1,145,421 * |
| | | | | | $8,974,368 |

\* FFEL funds are loans to students/parents guaranteed by the U.S. government. The estimated loss of these program funds, as evidenced in the U.S. Department of Justice's letter dated July 14, 2006, is approximately 8.15% due to expected collections and refunds. I do not have access to sufficient data to corroborate this estimated loss percentage, but used it in the above calculation.

The above amounts are cited because under Regulations of the U.S. Department of Education, as cited throughout Plaintiff's exhibits, the payment of enrollment incentives is a direct violation of those regulations and, if known to ED, before disbursement of such Title IV funds, such disbursements would not have taken place. Recent activities by ED's Office of the Inspector General in the review of auditors' workpapers to determine that sufficient efforts are being made to detect the payment of incentives further indicates ED's on-going concern over this practice.

The above are my preliminary opinions and, as such, may change if additional information is provided to me. Please advise me if such information becomes available.

Respectfully,

LAZARD DANA LLP

*Jeffrey C. Froehle*

Jeffrey C. Froehle, CFE, CPA
Partner